**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **SAFIYA GHORI-AHMAD**<br>1804 N. Quinn Street, Apt. 308<br>Arlington, VA  22209 | )<br>)<br>)<br>)<br>) |
| Plaintiff, | ) Civil Case No.<br>) |
| v. | )<br>) |
| **UNITED STATES COMMISSION ON<br>INTERNATIONAL RELIGIOUS FREEDOM**<br>800 N. Capitol Street, NW, Suite 790<br>Washington, DC  20002 | )<br>)<br>)<br>)<br>) |
| Defendant. | ) **JURY TRIAL DEMANDED**<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Safiya Ghori-Ahmad alleges, based on personal knowledge, information, belief, and materials obtained through civil discovery, as follows:

## INTRODUCTION

1.     Safiya Ghori-Ahmad brings this action against the United States Commission on International Religious Freedom ("USCIRF" or "the Commission")—an independent body created by Congress to promote the rights of religious minorities around the world—for retracting a permanent job offer because she is Muslim and of South Asian heritage, and for retaliating against her when she sought redress under the civil rights laws of the United States.

2.     Ms. Ghori-Ahmad applied for, was offered, and accepted a permanent position as a South Asia Policy Analyst at USCIRF.  Her academic credentials, language skills, work

history, and experience in the South Asia region made her the strongest applicant of the more

than 300 others who applied.  The USCIRF professional staff who interviewed Ms. Ghori-

Ahmad unanimously recommended offering her the job, and USCIRF's Executive Director

subsequently did so.  Ms. Ghori-Ahmad accepted the offer and resigned from her then-current

job at the Muslim Public Affairs Council, agreeing to start at USCIRF several weeks later.

3.      Ms. Ghori-Ahmad is Muslim, her ancestors emigrated from India to the United

States (where Ms. Ghori-Ahmad was born and raised), and she had advocated on behalf of civil

rights for American-Muslims in her former job.  When certain USCIRF Commissioners—in

particular then-Commissioners Nina Shea and Felice Gaer—learned *those* facts about Ms. Ghori-

Ahmad (as opposed to her qualifications) they worked vigorously to reverse USCIRF's hiring of

her.  Commissioners Shea and Gaer, in cooperation with then-USCIRF Chair Leonard Leo,

ultimately forced USCIRF to retract the job Ms. Ghori-Ahmad had already accepted.

4.      Internal USCIRF email and discussions make clear that Ms. Ghori-Ahmad's

national origin and religion drove USCIRF's ultimate decision to rescind its job offer.  For

example, Commissioner Shea, a particularly influential voice with long tenure on the

Commission, wrote that hiring a Muslim like Ms. Ghori-Ahmad to analyze religious freedom in

Pakistan would be like "hiring an IRA activist to research the UK twenty years ago."

5.      Commissioners Shea and Gaer intervened *after* USCIRF offered Ms. Ghori-

Ahmad the job and she accepted it.  However, once they did interfere, USCIRF subjected

Ms. Ghori-Ahmad to further hurdles that no other prospective employee had ever been forced to

undertake.  For example, USCIRF demanded that Ms. Ghori-Ahmad produce—in 36 hours, over

a weekend—an essay on religious persecution in Pakistan to demonstrate her lack of bias.  But

passing these tests (which she did) made no difference to the Commissioners who opposed working with a Muslim.

6.      USCIRF reneged on its decision to hire Ms. Ghori-Ahmad four weeks after Ms. Ghori-Ahmad accepted the position.  By that time, Ms. Ghori-Ahmad had left her prior job and could not go back.  USCIRF's acting Executive Director admitted to Ms. Ghori-Ahmad that Commissioner bias was the reason that USCIRF reversed its decision to hire her (though he was instructed to give a pre-textual reason).  At the time USCIRF withdrew the offer, not a single USCIRF Commissioner had ever met or spoken with Ms. Ghori-Ahmad.  Nor would they ever address the refusal to allow her to start in her new position, despite her repeated requests.

7.      Instead of a permanent position, USCIRF then offered Ms. Ghori-Ahmad a temporary 90-day position without benefits, and with responsibilities much reduced from the original scope of the position.  Commissioners Shea, Gaer, and Leo, operating under the mistaken assumption that Ms. Ghori-Ahmad was Pakistani, demanded that USCIRF omit Pakistan from her portfolio.  No other USCIRF employee has been forced to undergo probationary, temporary employment prior to permanent employment, nor has any other USCIRF employee had his or her scope of duties limited on the basis of religion or national origin.

8.      Ms. Ghori-Ahmad worked to turn the temporary job into a permanent one (having been led to believe that this was the plan).  However, the temporary job did not become permanent, despite a letter from USCIRF's entire professional policy staff urging the Commissioners to hire her and high praise from her supervisor.  The job never became permanent—despite Ms. Ghori-Ahmad's qualifications and performance—because Ms. Ghori-Ahmad is an American Muslim of Indian descent, and because she dared to report USCIRF's

discrimination to the Equal Employment Opportunity Commission ("EEOC").

9.      After USCIRF failed to extend the position, Ms. Ghori-Ahmad was left unemployed in a bad economy.  She endured severe emotional and physical stress as a result of being hired initially on the basis of her obvious qualifications (and leaving her old job) only to be ultimately rejected by USCIRF because of her religion and heritage; having to prove herself during a probationary position with USCIRF instead of the permanent one she was offered and had accepted; and USCIRF's retaliation once she reported USCIRF's conduct to the EEOC.

10.     USCIRF's discrimination and retaliation against Ms. Ghori-Ahmad violated U.S. civil rights law.  Specifically, as alleged in detail below, USCIRF's actions in reversing its decision to hire Ms. Ghori-Ahmad because of her religion and her national origin constitutes unlawful discrimination under Title VII of the Civil Rights Act of 1964, made applicable to USCIRF by the Congressional Accountability Act of 1995 (2 U.S.C. § 1311, *et seq.*), and the United States Commission on International Religious Freedom Reform and Reauthorization Act of 2011 (Pub. L. No. 112-75).  USCIRF's retaliation over her civil rights claim likewise constitutes a separate illegal act under Title VII and the Congressional Accountability Act.  In addition, Ms. Ghori-Ahmad detrimentally relied on USCIRF's employment offer when she left her prior job.

11.     Ms. Ghori-Ahmad seeks back pay, compensation, and other equitable relief to remedy the injuries she suffered due to USCIRF's discrimination and retaliation.

## PARTIES

12.     Plaintiff Safiya Ghori-Ahmad is a practicing Muslim and U.S. citizen of Indian descent.  She resides in Arlington, Virginia.

13.     Defendant United States Commission on International Religious Freedom ("USCIRF" or "the Commission") is a nine-member, independent federal government

commission, with offices located at 800 N. Capitol Street, NW, Suite 790, Washington, DC 20002.  USCIRF was established by the International Religious Freedom Act of 1998, 22 U.S.C. § 6401 (2006) (" IRFA").  USCIRF's authorizing statute has been amended several times, most recently by the United States Commission on International Religious Freedom Reform and Reauthorization Act of 2011, Pub. L. No. 112-75, 125 Stat. 1272.

14.     USCIRF's Commissioners are appointed either by the President or the leadership of the United States Senate or the United States House of Representative.  Congress charged USCIRF with monitoring the status of freedom of religion abroad and providing policy recommendations to the President, Secretary of State, and Congress.  The legislation that created USCIRF propounds that "[t]he right to freedom of religion undergirds the very origin and existence of the United States" and announces that it shall be the policy of the United States "to condemn violations of religious freedom."  IRFA, 22 U.S.C. § 6401(a)(1) and (b)(1).  USCIRF's mission of "evaluating United States Government policies in response to violations of religious freedom" reflects Congress's deep interest in religious freedom.  A full-time professional staff runs the day-to-day operations of USCIRF and supports the activities of the Commissioners.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under 2 U.S.C. § 1404, the Congressional Accountability Act of 1995.

16.     This Court has subject matter jurisdiction pursuant to 2 U.S.C. § 1408 and Section 3 of United States Commission on International Religious Freedom Reform and Reauthorization Act of 2011 , Pub. L. No. 112-75, 125 Stat. 1272,

17.     Venue is proper in this district pursuant to 28 U.S.C. § 1391.  The Defendant is located in and provides its official functions in the District of Columbia.  All or a substantial part

of the events, acts, or omissions giving rise to Plaintiff's causes of action and claims for relief occurred in the District of Columbia.

## FACTS

### USCIRF Hires Ms. Ghori-Ahmad for a Policy Analyst Position

18.     On or around March 2009, USCIRF began advertising for a South Asia Policy Analyst.  USCIRF's then-Executive Director James Standish authorized the advertisement of the South Asia policy analyst position on USCIRF's website, http:/www.uscirf.gov.

19.     USCIRF staff forwarded the job listing to their professional contacts, including those at the U.S. Department of State and other federal agencies.  USCIRF also advertised the position in *The Washington Post.*

20.     According to the job listing, the South Asia Policy Analyst would be responsible for monitoring developments in U.S. foreign policy and related human rights issues in India, Pakistan, and Afghanistan; making recommendations to promote religious freedom; drafting briefing materials, reports, correspondence, and testimony; and promoting USCIRF among representatives of religious communities and non-governmental organizations, as well as the U.S. State Department and other government bodies.

21.     The posting stated that the position required "strong research skills, policy experience, a terminal degree (JD or PhD), or substantial experience in the region, and knowledge in the areas of foreign affairs and human rights including religious freedom."  It also said that knowledge of local languages would be an advantage.

22.     Ms. Ghori-Ahmad was amply qualified for the position.  Ms. Ghori-Ahmad earned a Bachelor's degree in Political Science and Middle East Studies, a law degree, and a Master of Arts in International Development from the University of Arkansas, her home state. She had native-speaker proficiency of Urdu and Hindi, the national languages of Pakistan and

India respectively, and was proficient in modern Arabic.  Prior to April 2009, Ms. Ghori-Ahmad

had studied and written academically on South Asia politics and religious issues, and had

traveled extensively in the region.

23.     At the time she applied for the position with USCIRF, Ms. Ghori-Ahmad was the

D.C. Director of Government Relations for the Muslim Public Affairs Council, which is a

mainstream American Muslim civil rights, advocacy, and public policy organization.  As

described on its website:

> The Muslim Public Affairs Council is a public service agency working for the
> civil rights of American Muslims, for the integration of Islam into American
> pluralism, and for a positive, constructive relationship between American
> Muslims and their representatives.
>
> Since 1988, MPAC has worked diligently to promote a vibrant American Muslim
> community and enrich American society through exemplifying the Islamic values
> of Mercy, Justice, Peace, Human Dignity, Freedom, and Equality for all.[1]

24.     While employed by the Muslim Public Affairs Council, Ms. Ghori-Ahmad

regularly appeared on interfaith panels and conducted outreach to members of different faiths.

She worked with state and federal legislators, governmental bodies like the U.S. Department of

State, and non-governmental organizations on civil rights and human right issues, including

religious freedom.  In her position at the Muslim Public Affairs Council, Ms. Ghori-Ahmad

engaged with Members of Congress and senior U.S. State Department officials, and briefed the

U.S. Special Envoy to the Organization of the Islamic Conference on Islam, and Muslim

community leaders.  Ms. Ghori-Ahmad regularly met with the staff of the U.S. Senate Homeland

Security and Governmental Affairs Committee, which conducted numerous hearings on

detainees, national security, and Muslim radicalization.

---

[1]     *About*, Muslim Public Affairs Council, http://www.mpac.org/about.php.

25.     On April 22, 2009, Ms. Ghori-Ahmad applied for the Policy Analyst position at USCIRF.  Her application was one of over 300 that USCIRF received.  Out of the hundreds of applicants, only six (of which Ms. Ghori-Ahmad was one) were asked to interview for the job.

26.     Knox Thames, USCIRF's Director for Policy and Research, contacted Ms. Ghori-Ahmad to invite her for formal interviews, which occurred in USCIRF's offices on May 18, 2009.  Ms. Ghori-Ahmad met with Mr. Thames for forty-five minutes, and was also interviewed by the deputy director for policy, a senior policy analyst, and the then-current South Asia policy analyst, who, at the time of Ms. Ghori-Ahmad's application, was leaving USCIRF.

27.     Mr. Thames and the other interviewers unanimously agreed that Ms. Ghori-Ahmad was by far the most qualified candidate for the Policy Analyst position.  Mr. Thames testified in a deposition that Ms. Ghori-Ahmad was chosen because "she speaks the main language of Pakistan and India, has a JD, has written on these countries, has great connections in [the Department of] State, knows how to engage government agencies, her writings are mainstream and she's avoided controversial issues."

28.     Then-USCIRF General Counsel, Walter DeSocio, reviewed the writing samples Ms. Ghori-Ahmad submitted and reported that he found "nothing problematic" in them.  He also performed a background check on Ms. Ghori-Ahmad and reported finding no "red flags."

29.     Mr. Standish contacted Ms. Ghori-Ahmad on June 1, 2009, and offered her the Policy Analyst position.  He told Ms. Ghori-Ahmad that the USCIRF professional staff who interviewed her identified her as their first choice for the position, and he was enthusiastic about bringing Ms. Ghori-Ahmad on board.  However, Mr. Standish also told Ms. Ghori-Ahmad that her "background" would make the hire controversial with certain USCIRF Commissioners, in

particular Nina Shea and Felice Gaer.  He assured her that the Commission had delegated to him the authority to fill the position which he had just offered her.

30.     Ms. Ghori-Ahmad received an official written offer letter from USCIRF on June 4, 2009 and Ms. Ghori-Ahmad accepted on or before June 12, after several days of salary negotiations.  She and Mr. Thames subsequently agreed that she would start at USCIRF on July 14, 2009, for a salary of $81,000 and the benefits accorded U.S. federal government employees.  Such benefits included enrollment in the Federal Employees Health Benefits Program, paid vacation, employer matching of contributions to the Thrift Savings Plan (the federal employee 401(k) plan), and transportation subsidies.  USCIRF employees also are eligible for and regularly receive an annual bonus.

31.     Shortly after receiving her offer letter and accepting the policy analyst job, Ms. Ghori-Ahmad resigned from her position at the Muslim Public Affairs Council.

### USCIRF Retracts Ms. Ghori-Ahmad's Hiring Over Commissioner Concerns About Her Muslim Faith and South Asian National Origin

32.     On June 18, 2009, Mr. Standish resigned from his position as Executive Director of USCIRF.  Mr. Thames was appointed Acting Executive Director while USCIRF undertook a search for a permanent replacement.

33.     Shortly after Mr. Standish's resignation, Mr. Thames asked Ms. Ghori-Ahmad to meet him at an Au Bon Pain cafe near the USCIRF offices at Union Station.  There, Mr. Thames informed her that Mr. Standish had left USCIRF.  During that conversation, Mr. Thames also told Ms. Ghori-Ahmad, just as Mr. Standish had before, that Ms. Shea would be upset that USCIRF had hired her because she was Muslim and had been affiliated with a Muslim organization.  Ms. Ghori-Ahmad told Mr. Thames that she was still counting on the job because

she had resigned from her prior one.  She expressed confidence that if given the opportunity to

meet with the Commissioners, they would have no objections to her.

34.  Mr. Thames then suggested ways that Ms. Ghori-Ahmad could limit the negative

impression her beliefs and her background would create with members of the Commission:

- He pushed back her start date to Friday, July 17 as the Commissioners would be in the office earlier in the week.  He told Ms. Ghori-Ahmad he was worried how Commissioners would react if they met her before he could point to quality work she had completed.

- He also suggested that she "call in sick" on the days that Commissioners Shea and Gaer were in the office.

- He requested that she obtain a letter from U.S. Senator Joseph Lieberman's legislative director, who was one of Ms. Ghori-Ahmad's references earlier in the process, to show the Commissioners she had support from the office of a prominent Senator who is a well-known national security hawk.

- He encouraged Ms. Ghori-Ahmad to downplay her religious affiliation. He said that he and Ms. Ghori-Ahmad would highlight the fact that she had once worked for a Baha'i organization, as opposed to the Muslim one she had just left.

- Finally, he told Ms. Ghori-Ahmad together they would emphasize that she was a mainstream and "moderate" Muslim.  As an example, Mr. Thames noted that Ms. Ghori-Ahmad "didn't even cover her hair."

35.  On Friday, June 26, 2009, Mr. Thames told Leonard Leo, the then-incoming chair

of USCIRF, that USCIRF had hired Ms. Ghori-Ahmad for the South Asia policy analyst

position, and explained her qualifications.  Mr. Leo was enthusiastic about the hire and noted that

she had impressive credentials.

36.  Mr. Thames testified that as he and Mr. Leo were discussing Ms. Ghori-Ahmad's

arrival, they were joined by then-Commissioner Nina Shea.  Ms. Shea was one of the original

members of the Commission when it was first created by Congress in 1998.  Ms. Shea is a long-

time vocal critic of Islam as a religion, majority-Muslim countries, and Muslims generally.

37.     Ms. Shea expressed a harshly negative view of Ms. Ghori-Ahmad when she learned of the hire.  She said that she doubted Ms. Ghori-Ahmad could approach religious freedom issues without bias and even insinuated that Ms. Ghori-Ahmad was a "plant" for a Muslim organization.  Ms. Shea's reaction was entirely based on Ms. Ghori-Ahmad's apparent faith (Muslim), her national origin (South Asia), and those she affiliated with (other Muslims).  Ms. Shea had never met Ms. Ghori-Ahmad or reviewed her qualifications or writing.  Nonetheless, she expressed strong and immediate opposition to the hire.

38.     Ms. Shea agreed to a test of Ms. Ghori-Ahmad's ability to write objectively about religious freedom in majority-Muslim countries.  To that end, Mr. Leo and Ms. Shea directed Mr. Thames to ask Ms. Ghori-Ahmad to draft a paper on religious issues in Pakistan, one of the countries that would be in her portfolio as South Asia Policy Analyst.  Ms. Shea said that including information about Ahmadis (a minority religious group persecuted in the region), would be critical for Ms. Ghori-Ahmad to pass her test.

39.     On the afternoon of Saturday, June 27, Mr. Thames wrote to Ms. Ghori-Ahmad and asked her to draft a "document highlighting the religious freedom concerns that you see in Pakistan and areas where additional [U.S. government] and/or Pakistani government action is needed"—and to submit it to him by the end of the next day.  As requested, Ms. Ghori-Ahmad submitted the paper on or around midnight that Sunday.  Her paper described the persecution of religious minorities in Pakistan, including Christians, Hindus, Shi'a, and Ahmadis.  She noted the existence of "blasphemy laws" used to intimidate (or even imprison and put to death) purported critics of Islam and ordinances that are routinely applied more strictly to women and religious minorities.

40.     No other candidate for a position at USCIRF—much less one that USCIRF had already hired—has ever been asked to submit to a test like the one Ms. Ghori-Ahmad was required to undertake after she had agreed to begin work at USCIRF.  USCIRF has not required any non-Muslim or non-South Asian job candidate to write an essay to prove they could be objective and unbiased.

41.     That Monday, Ms. Shea reviewed the paper and found it "acceptable" with "no obvious signs of bias."  Yet she nonetheless continued to object to Ms. Ghori-Ahmad's hire and even rejected Ms. Ghori-Ahmad's response to the very test she had suggested.  Ms. Shea wrote in an e-mail that the lack of bias was predictable because it would have been "really stupid" for Ms. Ghori-Ahmad to have revealed what Ms. Shea believed must be her real views in such an exercise.

42.     Ms. Shea continued to vehemently oppose the hire of Ms. Ghori-Ahmad in emails and conversations with USCIRF Commissioners and staff.  Each reason she gave related to Ms. Ghori-Ahmad's faith or national origin.  For example, Ms. Shea described in an internal email her own past differences with *other* Muslims about policy and faith issues as a reason to reject Ms. Ghori-Ahmad.  Ms. Shea complained that "***they*** will play semantics and practice verbal contortionism" (emphasis added).

43.     Ms. Shea also focused on Ms. Ghori-Ahmad's national origin.  She wrote to Mr. Leo and Mr. Thames that Ms. Ghori-Ahmad's writings (which USCIRF's general counsel vetted and found acceptable) revealed Ms. Ghori-Ahmad's "evident Pakistani perspective regarding India-Pakistan issues," though Ms. Ghori-Ahmad happens to be Indian-American.

44.     Ms. Shea even explicitly compared Ms. Ghori-Ahmad to a terrorist, writing that hiring Ms. Ghori-Ahmad—a 26-year-old American born and educated in Arkansas—to analyze

religious freedom in Pakistan would be like "hiring an IRA activist to research the UK twenty years ago."

45.     By contrast, Ms. Shea never discussed Ms. Ghori-Ahmad's credentials (such as her law degree and masters degree in international development), her qualifications (such as her fluency in three languages common to the region), or her experience (such as extensive work with government staff and NGOs), except insofar as it related to her being Muslim or affiliating with other Muslims.

46.     Several days after Ms. Ghori-Ahmad submitted the impromptu paper, Mr. Leo, Ms. Shea, and a third Commissioner, Felice Gaer, decided to reverse USCIRF's decision to hire Ms. Ghori-Ahmad and retract the job before she started.  Mr. Leo informed Mr. Thames of the three Commissioners' decision.  However, to conceal the real reason for rescinding Ms. Ghori-Ahmad's offer, he directed Mr. Thames to tell Ms. Ghori-Ahmad and the USCIRF staff that the retraction was due to a "hiring freeze" resulting from the Executive Director's departure. Mr. Leo, Ms. Shea, and Ms. Gaer never met or spoke to Ms. Ghori-Ahmad prior to their decision and their instructions to Mr. Thames.

47.     On July 1, 2009, Mr. Thames met with Ms. Ghori-Ahmad at a location outside of USCIRF's offices—again, the Union Station Au Bon Pain cafe—to carry out the USCIRF Commissioners' orders.  Mr. Thames was visibly uncomfortable when he greeted Ms. Ghori-Ahmad.  At first, Mr. Thames told her what the Commissioners had directed him to say that the offer was withdrawn because of a "hiring freeze" imposed when the Executive Director resigned. Ms. Ghori-Ahmad asked directly if the real reason for the retraction was what she had discussed before with Mr. Thames and Mr. Standish—that certain Commissioners objected to her Muslim faith and affiliation.  Mr. Thames nodded.  He said he was sorry this had happened.

48.     Mr. Thames emphasized that he was just the messenger and the decision had come from certain Commissioners.  Convinced that she could overcome the Commissioners' objections to her faith and background if they actually met her, Ms. Ghori-Ahmad asked for a meeting so they could see that she was "not threatening."  Mr. Thames told her "the Commissioners did not want to deal with your problem anymore."

49.     When Mr. Thames notified Ms. Ghori-Ahmad that the job was no longer available for her, Ms. Ghori-Ahmad could not return to work at the Muslim Public Affairs Council.

50.     Ms. Ghori-Ahmad contacted Mr. Thames on July 2, 2009, and requested an official letter of retraction.  She also sent a memorandum to Mr. Leo and USCIRF Vice Chairs Michael Cromartie and Elizabeth Prodromou outlining her situation and seeking clarification for the retraction.  She received neither a formal letter of retraction nor a response to her request.

### The "Hiring Freeze" Was a Pretext for USCIRF's Discrimination

51.     Mr. Thames and Commissioners Leo, Shea, and Gaer told Ms. Ghori-Ahmad and USCIRF staff that USCIRF's decision to rescind the job offer she accepted was due to a hiring freeze triggered by Mr. Standish's departure.  In fact, as internal USCIRF email and staff testimony establish, the "hiring freeze" was simply a pretext to conceal the real reason Ms. Ghori-Ahmad's offer was withdrawn—her religion and her ethnic background.

52.     For example, Mr. Thames informed Mr. Leo, the incoming USCIRF chair, about the hire on June 26, eight days after Mr. Standish resigned.  Mr. Leo did not express any concern then that there was no permanent executive director in place at the time of Ms. Ghori-Ahmad's start date.  In fact, he was enthusiastic about bringing her on staff.  It was only after Ms. Shea and Ms. Gaer objected to Ms. Ghori-Ahmad's religion and background that Mr. Leo and USCIRF adopted the false "hiring freeze" explanation.

53.     Mr. Leo later admitted as much in an email to Ms. Gaer, one of the Commissioners opposed to Ms. Ghori-Ahmad's hire.  Mr. Leo wrote "Knox has been instructed to explain that the change in course is due to the change in ED's, and that it would not be fair to bind the new ED to a hire he didn't make.  This buys us time."  When Mr. Thames told Ms. Ghori-Ahmad about the retraction, he initially told her the reason was a "hiring freeze," as instructed.  However, in that same conversation, Ms. Ghori-Ahmad directly asked him if "the real reason" for the change in hiring policy was Ms. Ghori-Ahmad's religion and background. Mr. Thames admitted that it was.

54.     Notwithstanding the "freeze," USCIRF went on to hire at least three other employees between Mr. Standish's departure and the naming of a new Executive Director.  One of the new hires, a staff researcher, was handed the South Asia portfolio, although she did not have either the language skills or regional experience that Ms. Ghori-Ahmad had.  Even members of the Commission privately noted the obvious inconsistency, writing in an internal email after the freeze was selectively lifted for another position:  "This is one of the research-policy staff posts.  How can this one be filled and others frozen?"

**USCIRF Retaliated Against Ms. Ghori-Ahmad After She Filed a Complaint with the Equal Employment Opportunity Commission**

55.     After Ms. Ghori-Ahmad's full-time policy analyst job was retracted, Mr. Thames proposed to the Commission that Ms. Ghori-Ahmad work at USCIRF for 90 days on a temporary basis.  He told Ms. Ghori-Ahmad that he would try to commend her work to the Commission during this time period and secure her a permanent position. The Commissioners discussed the temporary position for Ms. Ghori-Ahmad at USCIRF's July 15, 2009, meeting.  At least one Commissioner, Don Argue, disputed whether a hiring at this level even necessitated Commissioner involvement.

56.     No non-Muslim prospective USCIRF employee has been demoted to a temporary

position or probationary period from a full-time position before even starting her job.  No non-

Muslim employee has been required to prove herself internally to USCIRF Commissioners over

a three-month period in order to obtain a full-time position she had already been offered and

accepted.

57.     The Commissioners ultimately decided to offer Ms. Ghori-Ahmad a temporary

position, though Ms. Shea and Ms. Gaer voted against employing her at all, even temporarily.

Mr. Leo abstained from the vote.  Ms. Shea insisted that Ms. Ghori-Ahmad have no

responsibilities related to Pakistan during her brief time at USCIRF, and Pakistan was omitted

from her portfolio.

58.     Ms. Ghori-Ahmad accepted the temporary position and began work at USCIRF

on July 27, 2009.  She reported directly to Mr. Thames and a Senior Policy Analyst and worked

at their direction.  She worked at USCIRF's offices using their equipment.

59.     In the course of her three-month temporary position, Ms. Ghori-Ahmad edited

and rolled out the India Chapter of USCIRF's annual report, drafted a letter requesting a

USCIRF meeting with Ambassador Richard Holbrooke, and wrote an opinion piece for

Commissioners Talal Eid and Don Argue that appeared in the *Atlanta Journal Constitution*,

among other accomplishments.  These responsibilities were similar to those she would have

performed as South Asia Policy Analyst.

60.     While attending meetings on behalf of USCIRF and in other official dealings

outside of USCIRF, Ms. Ghori-Ahmad was directed to introduce herself as a member of

USCIRF's staff and was referred to by others in such communications as a member of USCIRF's

staff.  On or around September 2, 2009, USCIRF posted a short biography of Ms. Ghori-Ahmad

on the Commission's website, but Ms. Shea demanded that it be taken down.  USCIRF immediately removed the bio.

61.     On August 14, 2009, Ms. Ghori-Ahmad sought EEO counseling to investigate the reason for her job retraction pursuant to Title VII of the Civil Rights Act of 1964.  On September 4, 2009, Mr. Thames asked Ms. Ghori-Ahmad to accompany him downstairs in the elevator.  When they arrived in the lobby, Mr. Thames said he had learned she had filed a complaint with the EEO.  He was visibly upset and told her he could no longer recommend her for permanent employment with USCIRF.  Mr. Thames also called Mr. Leo to notify him of the EEO filing.  According to Mr. Thames, when Mr. Leo learned of Ms. Ghori-Ahmad's complaint, he "was upset" and wanted to "hav[e] her escorted from the building."

62.     Ms. Shea reacted harshly to penalize Ms. Ghori-Ahmad for trying to protect her civil rights through the EEO process.  For example, in a September 21, 2009, email with the subject line "eeoc" flagged as "high" importance, Ms. Shea wrote to Mr. Leo, Ms. Gaer, and Mr. Desocio to demand that Ms. Ghori-Ahmad "be isolated since she has taken an adversarial position against us."  That Ms. Ghori-Ahmad continued to have any substantive responsibilities in light of her EEO complaint was "outrageous" in Ms. Shea's view, and it was "uncomfortable" to have her in meetings.  Ms. Shea demanded that Ghori-Ahmad's "adversarial … role be made clear to Steve, Knox, and other relevant staff" (i.e., Ms. Ghori-Ahmad's immediate supervisor and the acting Executive Director).

63.     USCIRF did isolate Ms. Ghori-Ahmad, just as Ms. Shea demanded.  After she filed her EEO complaint, Ms. Ghori-Ahmad received fewer work assignments, and the ones she did receive were less substantive than the ones she had previously been given.  She had fewer and fewer opportunities to interact with the Commission and Commissioners.  In addition,

Mr. Thames stopped discussing how to promote her to a full-time position, and, as described above, expressly told Ms. Ghori-Ahmad that her complaint would probably mean the Commissioners would be unwilling to give her a full-time position.

64.    Ms. Ghori-Ahmad's 90-day temporary position was slated to end on October 27, 2009.  On the eve of her departure, members of USCIRF's professional staff launched a last-ditch effort to keep her at the Commission.  All seven members of USCIRF's professional policy staff joined an email to the full Commission:

> We are writing to support the continued employment of Safiya Ghori-Ahmad. We have a high opinion of Safiya's work at the Commission. … We realize there is a reluctance to make staff hiring decisions without a new Executive Director in place, but given that two South Asian countries are among our top priorities, without Safiya's expertise we will be even more short staffed than before.  We do not believe there are adequate staff resources to cover this critical region.  At the very least, during this interim period, we hope you would consider renewing Safiya's contract until the new Executive Director, in consultation with the Director of Policy, can assess her contribution and skills.

65.    Mr. Thames, who supervised Ms. Ghori-Ahmad during her three-month temporary employment, similarly told the Commissioners via email that Ms. Ghori-Ahmad was "exceptionally well qualified" for the position and had delivered excellent work in her time at USCIRF.  He urged that her employment be continued.

66.    Despite the excellent quality of Ms. Ghori-Ahmad's work and the clear need for her expertise, USCIRF ignored the recommendations of its professional staff.  Rather, it heeded the will of Commissioner Shea, who never wanted a Muslim in the job in the first place, let alone one that had reported her treatment to the EEOC.  USCIRF did not extend Ms. Ghori-Ahmad's employment.

### Other Evidence Suggesting Unlawful Discrimination at USCIRF

67.     USCIRF had no Muslim staff at the time they rejected Ms. Ghori-Ahmad.  There was only one Muslim on the Commission itself—and Commissioners are appointed by Congress or the President, not USCIRF itself, and not subject to challenge by other Commissioners.

68.     Ultimately, USCIRF assigned the South Asia policy duties to two staff members far less qualified than Ms. Ghori-Ahmad.  Unlike Ms. Ghori-Ahmad, neither staff member had law degrees, neither spoke any of the languages of South Asia, and neither had any experience with the region.  Unlike Ms. Ghori-Ahmad, both were white Christians with no record of affiliating with Muslims.

69.     Ms. Ghori-Ahmad's experience is part of a pattern of bias against Muslims, and certain ethnicities identified with Islam, who applied for positions with USCIRF.  For example, on April 23, Mr. Thames wrote in an email to Mr. Standish that Ms. Ghori-Ahmad seemed "great," but he asked "wouldn't we encounter the same issue that we've discussed with another applicant?"  Mr. Thames later testified that by "another applicant," he meant an Arab-American candidate for the Middle East Policy Analyst position at USCIRF.  Mr. Thames and Mr. Standish had decided that members of the Commission—in particular Ms. Shea and Ms. Gaer—would object to the hire given the candidate's background and the fact that he worked for the American-Arab Anti-Discrimination Committee and did not pursue his candidacy further.

70.     While USCIRF has been active on behalf of certain religious minorities—for example, Christian minorities in majority non-Christian countries—Commissioners Shea and Gaer, the same Commissioners who opposed hiring Ms. Ghori-Ahmad, have vigorously opposed similar initiatives on behalf of Muslim minorities in majority Christian counties.  For example, Ms. Shea opposed USCIRF's condemnation of a Swiss law introduced in 2007 to ban construction of minarets, which are a critical component of Muslim mosques.  Ms. Shea argued

in internal USCIRF meetings that Switzerland had the right to resist the "Islamification" of Christian nations.

71.     Likewise, Ms. Gaer resisted USCIRF making any statement against the French ban on head scarves, which are worn by some Muslim women.

### The Decisions to Advertise for a Policy Analyst and to Hire Ms. Ghori-Ahmad Were Authorized, Official Acts of USCIRF

72.     Under 22 U.S.C. § 6432(b), USCIRF is authorized to hire an Executive Director and Professional Staff.  The  statute in turn states that "the Commission and Executive Director" are authorized to hire staff below the level of the executive director.  22 U.S.C. §6432b(c).  In practice, USCIRF Executive Directors hired staff below the senior staff (i.e., policy analysts, senior policy analysts, researchers, etc.) directly under authority delegated by the Commission. With the sole exception of Ms. Ghori-Ahmad, such hires have never required approval by the Commission.  The Commission had never involved itself in a junior or mid-level staff hire until they intervened to overturn the Executive Director's decision to hire Ms. Ghori-Ahmad.

73.     As per practice and tradition, candidates for senior staff positions directly below the Executive Director (i.e., directors and assistant directors of departments) were vetted, and initially selected, by the Executive Director.  In contrast to the practice for hiring junior or mid-level staff, the Executive Director presented the candidates for senior staff positions to the Commission to ratify the choice.

74.     As of mid-June 2009—before the controversy over Ms. Ghori-Ahmad's position—all staff then currently at USCIRF had been hired under the practice described above. In 2008, during a USCIRF retreat while James Standish was serving as Executive Director, the Commission specifically ratified its long-time practice described above.  The Commission delegated to Mr. Standish the authority to directly hire junior and mid-level staff, reserving for

itself a role only in the hiring of senior staff.  Ms. Ghori-Ahmad was hired under that process and pursuant to that delegation of authority.

75.     In 2009, the South Asia Policy Analyst position was considered at the time to be a junior to mid-level staff position.  Formally, there were several layers of employees above the "policy analyst," including senior policy analysts and department directors and deputy directors. Policy analysts reported to the Director for Policy and Research (then Knox Thames), who reported to the Executive Director.  Prior to Ms. Ghori-Ahmad's experience, all employees of the policy analyst level in recent history had been hired directly by the Executive Director with no Commissioner involvement.

76.     USCIRF Commissioners knew that the current South Asia Policy analyst was leaving the position.  After her departure was announced, the South Asia Policy analyst position was openly advertised on USCIRF's website, in *The Washington Post*, and disseminated widely in the foreign policy community.

77.     While USCIRF has given several different reasons to its staff and to Ms. Ghori-Ahmad for rescinding its offer—including pretextual ones to hide the actual, discriminatory reason as described above—it never claimed that the reason was the Executive Director's lack of authority.  Indeed, the then out-going Chair of the Commission, Felice Gaer, conceded in an email to the then in-coming Chair, Lenard Leo, that Mr. Standish had been acting within his authority as the Executive Director.  Mr. Thames similarly admitted that the Commissioners had "no role" in hiring policy analysts.

### USCIRF's Discrimination and Retaliation Injured Ms. Ghori-Ahmad

78.     Ms. Ghori Ahmad resigned from her prior position when she accepted the policy analyst position at USCIRF.  She was unable to go back to that position when USCIRF decided she was no longer fit to work at the Commission.  While temporarily employed at USCIRF,

Ms. Ghori-Ahmad was not offered and did not receive the benefits to which full-time federal employees are entitled, including but not limited to health care benefits, TSP matching, paid vacation, accrual of seniority, and transportation benefits.

79.     When Ms. Ghori-Ahmad left her temporary position at USCIRF on October 27, 2009, she was unemployed.  She submitted around seven job applications at the height of a poor economy, but remained unemployed for a substantial period.

80.     Ms. Ghori-Ahmad suffered adverse emotional and physical stress and harm due to USCIRF's discrimination, retaliation, and her resulting unemployment.  She was prescribed high blood pressure medication for her migraine headaches, and other conditions.

**Ms. Ghori-Ahmad's Efforts to Remedy USCIRF's Unlawful Discrimination**

81.     Ms. Ghori-Ahmad contacted the EEO office for the U.S. General Services Administration, National Capitol Region, on August 14, 2009, within the statutorily required period.  She had an initial interview with an EEO counselor on September 9, 2009, and filed a formal complaint of discrimination with the EEO on September 17, 2009 (Discrimination Complaint Number 2009-NCR-ALD-SGA-3).

82.     USCIRF attempted to stonewall the investigation.  For example, it refused to allow the EEO counselor to interview any USCIRF Commissioner or to submit written responses on behalf of Commissioners.  USCIRF denied the EEO counselor conducting the official investigation into unlawful discrimination against Ms. Ghori-Ahmad access to the very individuals who were accused of religious discrimination and retaliation.

83.     The EEO counselor completed its Report of Investigation on March 1, 2010.  At the conclusion of the agency's investigation, Ms. Ghori-Ahmad requested a hearing before an Administrative Judge pursuant to 29 C.F.R. § 1614.108(g).  On May 7, 2010, the Washington Field Office of the EEOC issued its Acknowledgment and Order.

84.     The EEOC Administrative Judge allowed Ms. Ghori-Ahmad and USCIRF to obtain certain discovery from each other.  Once again, USCIRF denied access to the Commissioners themselves.  Despite Ms. Ghori-Ahmad's requests, USCIRF failed to produce documents from Commissioners or make even one Commissioner available for deposition.  To date, none of the Commissioners involved in rescinding Ms. Ghori-Ahmad's offer for a permanent job, or retaliating against her for her EEO activity, have had to account for themselves, under oath, and defend their conduct or otherwise take responsibility.

85.     After several months of attempting to defend its conduct on the merits, on July 13, 2010, after discovery was well under way, USCIRF moved to dismiss under 29 C.F.R. § 1614.109(b) and 29 C.F.R. § 1614.107(a)(1).  USCIRF—an entity created by Congress to promote religious freedom—argued that it could discriminate against employees on the basis of religion without sanction under because it was not subject to Title VII of the Civil Rights Act of 1964.

86.     Ms. Ghori-Ahmad opposed the motion.  On August 18, the Administrative Judge granted USCIRF's motion to dismiss in a one-sentence order.  By regulation, the decision of the Administrative Judge became USCIRF's final action on the complaint 40 days after the Administrative Judge's decision (in this case, September 27, 2010).  Ms. Ghori-Ahmad timely appealed that final agency action on November 24, 2010.

87.     Counsel for Ms. Ghori-Ahmad also contacted the Office of Compliance established by the Congressional Accountability Act to determine whether she could pursue her claim under that statute.  Counsel were advised by Office of Compliance staff that the Act did not apply to USCIRF.

88.     On September 15, 2011, the U.S. House of Representatives passed H.R. 2867, the United States Commission on International Religious Freedom Reform and Reauthorization Act of 2011, which contained a provision making USCIRF subject to the Congressional Accountability Act.  During Senate consideration of the legislation, Senator Richard Durbin successfully offered an amendment to the legislation that, among other things, made jurisdiction under the Congressional Accountability Act retroactively applicable to pending administrative claims, such as Ms. Ghori-Ahmad's.

89.     The Senate amendment also imposed retroactive term limits on USCIRF Commissioners.  Commissioners—including Nina Shea and Felice Gaer—who had already served more terms than the new term limits allows were given 90 days to transition off of the Commission.  In his floor statement explaining his amendment Senator Durbin said:

> I strongly support the mission of the U.S. Commission on International Religious Freedom, but I have been deeply troubled by allegations of misconduct, misuse of funds, and discrimination at the Commission. … My amendment will make good-government reforms to USCIRF that should help to address the concerns that have been raised about USCIRF.

90.     The Senate passed H.R. 2867 with the Durbin amendment on December 13, 2011. The House of Representatives adopted the Senate amendment on December 16, 2011.  On December 23, 2011, the President signed into law the United States Commission on International Religious Freedom Reform and Reauthorization Act of 2011, Pub. L. 112-75.

91.     Pursuant to that Section and the Congressional Accountability Act, Ms. Ghori-Ahmad filed a request for counseling with the Office of Compliance on December 27, 2011. Counseling was completed on January 25, 2012.

92.     Ms. Ghori-Ahmad and USCIRF participated in the mandated mediation session on March 1, 2012.  The mediation period concluded on March 7, 2012.  On March 13, 2012, Ms. Ghori-Ahmad received notice that the mediation period had ended.

## COUNT I:  RELIGIOUS DISCRIMINATION IN VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT

93.     Ms. Ghori-Ahmad re-alleges and incorporates by reference the allegations set forth in paragraphs 1-93.

94.     Ms. Ghori-Ahmad is a practicing Muslim.

95.     Ms. Ghori-Ahmad applied for and was qualified for the position of South Asia Policy Analyst, and received and accepted a formal offer of full-time employment from USCIRF.

96.     USCIRF withdrew the full-time position before she started because USCIRF Commissioners objected to hiring Ms. Ghori-Ahmad because of her Muslim faith.

97.     With the sole exception of Ms. Ghori-Ahmad, USCIRF has never retracted a position offered and accepted by a candidate, never required such a candidate to draft an impromptu writing sample, and never substituted a 90-day probationary position for a permanent one the candidate had already been offered and had accepted.

98.     Ms. Ghori-Ahmad's temporary employment was not extended as a result of her Muslim faith and the initiation of EEO proceedings.

99.     After the temporary position expired, the South Asian Policy Analyst position went unfilled.  The duties of the South Asian Policy Analyst were filled by less experienced individuals without region-specific knowledge or applicable language skills.

100.     But for her Muslim faith and race/national origin, USCIRF would have hired Ms. Ghori-Ahmad.

101.     Ms. Ghori-Ahmad lost income and other employment benefits and suffered adverse emotional and physical stress and harm due to USCIRF's discrimination and retaliation and her resulting unemployment.

## COUNT II:  DISCRIMINATION ON THE BASIS OF RACE/NATIONAL ORIGIN IN VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT

102.    Ms. Ghori-Ahmad re-alleges and incorporates by reference the allegations set forth in paragraphs 1-101.

103.    Ms. Ghori-Ahmad is a practicing Muslim and is of Indian heritage.

104.    Ms. Ghori-Ahmad applied for and was qualified for the position of South Asia Policy Analyst, and received and accepted a formal offer of full-time employment from USCIRF.

105.    USCIRF withdrew the full-time position before she started because USCIRF Commissioners objected to hiring Ms. Ghori-Ahmad due to her Muslim faith and her Indian heritage.

106.    With the sole exception of Ms. Ghori-Ahmad, USCIRF has never retracted a position offered and accepted by a candidate, never required such a candidate to draft an impromptu writing sample, and never substituted a 90-day probationary position for a permanent one the candidate had already been offered and had accepted.

107.    Ms. Ghori-Ahmad's temporary position was not extended as a result of her Muslim faith, Indian background, and the initiation of EEO proceedings.

108.    After the temporary position expired, the South Asian Policy Analyst position went unfilled for months.  The duties of the South Asian Policy Analyst were filled by less experienced individuals without region-specific knowledge or applicable language skills.

109.    But for her Muslim faith and race/national origin, USCIRF would have hired Ms. Ghori-Ahmad.

110.     Ms. Ghori-Ahmad lost income and other employment benefits and suffered adverse emotional and physical stress and harm due to USCIRF's discrimination and retaliation and her resulting unemployment.

## COUNT III:  RETALIATION FOR INITIATING EEO PROCEEDINGS IN VIOLATION OF THE CONGRESSIONAL ACCOUNTABILITY ACT

111.     Ms. Ghori-Ahmad re-alleges and incorporates by reference the allegations set forth in paragraphs 1-110.

112.     After USCIRF's permanent job offer was rescinded, Ms. Ghori-Ahmad was engaged as a temporary employee at USCIRF from July 27, 2009 to October 27, 2009. Ms. Ghori-Ahmad accepted a probationary position at USCIRF because USCIRF staff, including the acting Executive Director, represented to her that she could thereby obtain the full-time, permanent position she was offered.

113.     Ms. Ghori-Ahmad sought EEO counseling on August 14, 2009.  The EEO then began an informal investigation and contacted USCIRF regarding its investigation.  Ms. Ghori-Ahmad filed a formal EEO complaint on September 17, 2009.  USCIRF received notice of the complaint in a timely manner.

114.     After the Complaint was filed, USCIRF's staff and commissioners retaliated against her by giving her less work and tasks of considerably lesser difficulty.  Her colleagues and supervisors interacted with her less frequently.  One of the Commissioners threatened to have Ms. Ghori-Ahmad escorted from the building.  Another Commissioner demanded that she be isolated from the rest of the staff.  These actions were all taken in retaliation for Ms. Ghori-Ahmad's filing of an EEOC action.

115.     Ms. Ghori-Ahmad was not offered a permanent, full-time position at the end of her term, nor was her temporary period extended.  But for her EEO complaint, Ms. Gori-Ahmad

would have continued to receive more substantive work and exposure to the Commission and she would have received an extension of her temporary position and/or a permanent position at USCIRF.

116.    Ms. Ghori-Ahmad lost income and other employment benefits and suffered adverse emotional and physical stress and harm due to USCIRF's discrimination and retaliation and her resulting unemployment.

## COUNT IV:   DETRIMENTAL RELIANCE

117.    Ms. Ghori-Ahmad re-alleges and incorporates by reference the allegations set forth in paragraphs 1-116.

118.    Ms. Ghori-Ahmad received a letter from USCIRF on June 4, 2009, offering her the position of South Asia Policy Analyst.  Mr. Standish, the Executive Director of USCIRF, represented to Ms. Ghori-Ahmad that he had the authority to hire her.

119.    In reliance on the June 4 letter and Mr. Standish's representations, Ms. Ghori-Ahmad accepted the USCIRF offer and resigned from her then-current position as U.S. Director of Governmental Relations with MPAC.  Mr. Standish, Mr. Thames, and other USCIRF staff were aware of Ms. Ghori-Ahmad's reliance on the offer and her acceptance.

120.    Ms. Ghori-Ahmad was unable to return to her old job after she learned, four weeks later, that USCIRF was rescinding its offer because she is a Muslim and of South Asian heritage.

121.    Ms. Ghori-Ahmad accepted a temporary position at USCIRF because USCIRF staff, including the acting-Executive Director, represented to her that she could thereby obtain the full-time, permanent position she was offered.

122.     But for USCIRF's statements made through its official agents about its job offer, Ms. Ghori-Ahmad would have remained employed at her prior job.

123.     Ms. Ghori-Ahmad lost income and benefits, and suffered other injuries as described above, as a result of her reliance on USCIRF's representations.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff Ms. Ghori-Ahmad, respectfully requests this Court for the following relief:

124.     Enter a judgment in favor of Ms. Ghori-Ahmad and against the United States Commission on International Religious Freedom for discrimination on the basis of religion in violation of the Congressional Accountability Act of 1995, 2 U.S.C. § 1311, *et seq.*;

125.     Enter a judgment in favor of Ms. Ghori-Ahmad and against the United States Commission on International Religious Freedom for discrimination on the basis of national origin in violation of the Congressional Accountability Act of 1995, 2 U.S.C. § 1311, *et seq.*;

126.     Enter a judgment in favor of Ms. Ghori-Ahmad and against the United States Commission on International Religious Freedom for retaliation for EEO activity in violation of the Congressional Accountability Act of 1995, 2 U.S.C. § 1311, *et seq.*:

127.     Enter a judgment in favor of Ms. Ghori-Ahmad and against the United States Commission on International Religious Freedom for retaliation for detrimental reliance;

128.     An award to Ms. Ghori-Ahmad of back pay, in an amount to be determined at trial;

129.     An award to Ms. Ghori-Ahmad of compensatory damages, in an amount to be determined at trial;

130.     An award of reasonable attorneys fees and costs; and

131.     Such other relief as this Court finds to be just and proper.

## **JURY DEMAND**

Plaintiff demands a jury trial on all issues of fact and damages in this case.

Respectfully submitted this 7th day of June, 2012.

          */s/* Perry A. Lange

Eric Mahr (D.C. Bar # 459350)
*eric.mahr@wilmerhale.com*
Perry A. Lange (D.C. Bar # 494339)
*perry.lange@wilmerhale.com*
Stacy Frazier (D.C. Bar # 986806)
*stacy.frazier@wilmerhale.com*
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC  20006
Telephone:  (202) 663-6000
Fax:  (202) 663-6363

*Counsel for Plaintiff*