IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **SAFIYA GHORI-AHMAD** )<br>)<br>Plaintiff, )<br>vs. )<br>)<br>**UNITED STATES COMMISSION ON** )<br>**INTERNATIONAL RELIGIOUS** )<br>**FREEDOM** )<br>)<br>Defendant. ) | Civil Case No. 12-cv-00936-BJR |

## DECLARATION OF SAFIYA GHORI-AHMAD

Pursuant to 28 U.S.C. § 1746, I, Safiya Ghori-Ahmad, hereby declare and state as follows based on my personal knowledge:

1. I was employed at the United States Commission for International Religious Freedom ("USCIRF") from July 27, 2009 until October 27, 2009. In that capacity, I worked as the South Asia policy analyst and reported directly to Knox Thames.

2. In mid-July 2009, Mr. Thames offered me this temporary position after USCIRF withdrew its offer to hire me as the South Asia policy analyst on a permanent basis. I understood from my conversations with him and others that the purpose of the temporary position was to give me the opportunity to prove myself and transition to a full-time position.

3. I accepted the temporary position with the expectation that it would lead to the full-time South Asia Policy Analyst position for which I had originally been hired. Mr. Thames

repeatedly emphasized to me that during my tenure at USCIRF I could build the confidence of the Commissioners and demonstrate to them my skill set. He told me that if I did good work and he advocated on my behalf, the Commissioners would likely approve my full-time hire. I would not have taken the contract if there was no possibility of renewal or extension.

4. When I began at the Commission, I worked on issues related to Afghanistan, India, and Pakistan. Mr. Thames would frequently ask me to draft policy statements, letters, articles, or other substantive pieces of writing. He also sought my strategic advice on these topics, and made use of contacts that I had developed through my prior work in the relevant communities and in the U.S. government. My main projects when I started at the Commission included:



5. After I began the temporary contract with USCIRF, I continued to want my employment at the organization to become full-time and permanent. Mr. Thames and I discussed this

goal, and how to achieve it, several times a week. Mr. Thames told me that he conveyed to the Commissioners that I continued to seek to become a full-time employee at USCIRF.

6. Mr. Thames would often ask me to draft emails or talking points specifically so that he could forward my work to the Commissioners and demonstrate my skill set. For example, if a Commissioner asked a question or for an update on a topic, he would often ask me to draft a response, and we would together discuss how to best respond before I drafted a reply. I would then draft my emails or papers in based on our conversations, and he would forward these to the Commissioners, sometimes after we discussed my work product and I incorporated edits based on his comments.

7. I understand that Mr. Thames became aware that I had filed a request for counseling with the Equal Employment Opportunity Commission ("EEOC") on September 4, 2009 because he confronted me about it either the day he learned about it or shortly thereafter.

8. After that conversation with Mr. Thames, my work responsibilities significantly changed. Specifically, Mr. Thames stopped asking me to take primary responsibility for drafting policy statements, articles, and other substantive pieces of written work. Mr. Thames did not solicit my views on substance or strategy on these topics as he had prior to confronting me about my EEOC action. I instead received requests to provide small edits or inputs on work that was assigned to other people. For example, before I filed my action, Mr. Thames asked me to take the lead ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ After I filed my action, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Mr. Thames drafted the letter himself and only asked me for comments.

9. Any primary drafting or substantive work that I completed after the filing of the EEOC action was a continuation of work I had been assigned shortly after I started (such as working on the India chapter), but before my EEOC action was known by USCIRF. I was not, however, assigned any new substantive projects that required the same analytical or specialized skills I was able to employ on my initial assignments.

10. Additionally, much of the work I did was non-substantive or busy work. For example:



11. Prior to his learning of the EEOC action, Mr. Thames also would frequently ask me for the names of my personal contacts or other connections that would be helpful to carrying out USCIRF business. He stopped asking for contact information or other connections

after he learned of my EEOC action. He also stopped inviting me to meetings or asking me to attend external events on USCIRF's behalf.

12. When he confronted me over my EEOC action, Mr. Thames told me that we could no longer discuss how to turn the temporary position into a permanent one. He did not discuss it with me again after that, and I understood from that conversation that I was not to raise it with him either.

13. Mr. Thames was my main liaison to the Commissioners, with whom I did not have much direct involvement. My interactions with him decreased substantially after he learned of my EEOC action—his visits to my office for my advice or input decreased, as did his emails and telephone calls. We had gone to coffee several times before the EEOC action was filed, but did not do so after he learned of the action. He also stopped promoting my work product to the Commissioners or helping strategize how to best present my work, as described above in Paragraph 6.

14. Other individuals also stopped interacting with me after I filed my EEOC action. These individuals included David Dettoni, Dwight Bashir, Walter DeSocio, and Scott Flipse.

15. Prior to working for USCIRF, I was employed for three years by the Muslim Public Affairs Council, which is a faith-based civil rights organization of American Muslims. While there, I was familiar with the Muslim Public Affairs Council's vision statement, which is "[t]o establish a vibrant Muslim American community that will enrich American society through promoting the Islamic values of mercy, justice, peace, human dignity, freedom, and equality for all," and is located on its website at http://www.mpac.org/about/vision-and-mission.php.

I declare under penalty of perjury that that the forgoing is true and correct.

Presented on October 10, 2014

_____